# UNITED STATES DISTRICT COURT
for the
Eastern District of North Carolina

**FILED**
SEP 6 2019
PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY ___STS___ DEP CLK

In the Matter of the Seizure of )
*(Briefly describe the property to be seized)* )
2019 Toyota 4-Runner, Vehicle Identification ) Case No. 5:19-MJ-2066-RN
Number (VIN) JTEBU5JR0K5620629 )
)

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the ___Eastern___ District of ___North Carolina___ is subject to forfeiture to the United States of America under ___18___ U.S.C. § ___981 and 982___ *(describe the property)*:
2019 Toyota 4-Runner, Vehicle Identification Number (VIN) JTEBU5JR0K5620629

The application is based on these facts:
See attached affidavit.

☐ Continued on the attached sheet.

_____
*Applicant's Signature*

Robert A. Richards, Jr., Special Agent FBI
*Printed name and title*

_____
*Applicant's signature*

Eric J. Phillips, Special Agent IRS
*Printed name and title*

On this day, Robert A. Richards, Jr. & Eric J. Phillips appeared before me via reliable electronic means, placed under oath, and attested to the contents of this Application for a Seizure Warrant.

Date: September 6, 2019

_____
*Judge's signature*

City and state: Raleigh, NC

Robert T. Numbers, II, United States Magistrate Judge
*Printed name and title*



# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR A SEARCH AND SEIZURE WARRANT

STATE OF NORTH CAROLINA

COUNTY OF WAKE, to wit:

We, ERIC J. PHILLIPS and ROBERT A. RICHARDS, being first duly sworn, do hereby depose and say:

## INTRODUCTION

1. We make this affidavit in support of a seizure warrant pursuant to 18 U.S.C. §§ 981(b) and 982(b)(1), to seize for purposes of civil and/or criminal forfeiture the funds and assets described below as property representing the proceeds of, involved in, or facilitating violations of, 18 U.S.C. §§ 18 U.S.C. §§ 371 (Conspiracy), 1956(a)(1) (Laundering of Monetary Instruments), 1956(a)(2) (International Money Laundering), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 1956(h) (money laundering conspiracy), and offenses against a foreign nation involving the bribery of a public official:

   a. 2019 Toyota 4-Runner, Vehicle Identification Number (VIN) JTEBU5JR0K5620629, V-6, blizzard pearl in color, from Leith Toyota, 8005 Capital Boulevard, Raleigh, NC 27616. The total price listed on the Purchase Agreement dated 01/09/2019, was $46,939.13. The Purchase Agreement, the Customer Copy of the Cash Receipt, the Conditional Delivery Agreement, and the Leith Toyota Lifetime Trust agreement, all listing Tatyana Anatolyevna Teyf as the purchaser of

1



the Toyota 4-Runner. Leith Toyota also made a copy of Tatyana Anatolyevna Teyf's North Carolina Driver's License, driver's license number 30961901, displaying her full name, address, driver's license photo, and listing her date of birth as 07/28/1977.

## NATURE OF INVESTIGATION

2.  The grand jury has returned indictments charging LEONID I. TEYF, TATYANA A. TEYF, and others with violations of 18 U.S.C. §§ 371 (Conspiracy), 1956(a)(1) (Laundering of Monetary Instruments), 1956(a)(2) (International Money Laundering), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 1956(h) (Money Laundering Conspiracy), 26 U.S.C. §§ 7201 (Attempt to evade or defeat tax), 7203 (Willful failure to file return, supply information, or pay tax, 7206(1) (Fraud and false statements), and offenses against a foreign nation involving the bribery of a public official. 5:18-CR-452-FL.

3.  These charges arise from TEYF's transfer of criminally derived proceeds of specified unlawful activity into the United States and use of financial institutions within the United States to conceal or disguise the source, ownership, and control of said criminal proceeds, and from the spending of such proceeds.

## AFFIANT BACKGROUND

4.  I, Eric J. Phillips, am a Special Agent of the Internal Revenue Service Criminal Investigation Division ("IRS"). As such, I am a federal law enforcement officer within the meaning of Rule 41 of the Federal Rules of Criminal Procedure, and I am authorized to apply for and serve search and seizure warrants and make arrests.



I have been employed as an IRS Special Agent since January of 2010.

    a. As an IRS Special Agent, I received approximately 25 weeks of training in the investigation of criminal violations of the Internal Revenue Code, currency transaction offenses in violation of the Bank Secrecy Act, and the laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957. This training has specifically covered the means and techniques, by which individuals engaged in criminal activities derive, launder, conceal and spend their illegal profits, and their use of assets to facilitate their unlawful activity. My training has also included means and techniques used by individuals to evade reporting and paying income tax, including the use of nominees and misclassification of personal expenses as business expenses.

    b. I have been a Certified Public Accountant since January 2006 and became a Certified Fraud Examiner in November 2008.

    c. I have a Bachelor of Science in Business Administration with a concentration in Accounting from the University at Buffalo in Buffalo, New York and a Master of Science in Accounting and Information Technology from the University of Maryland University College in Adelphi, Maryland.

    d. I have been the affiant in over 40 authorized federal search and seizure warrants in several Federal judicial districts.



5. I, Robert A. Richards, Jr., am a duly appointed Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been employed as such since October 12, 1999. I am currently assigned to the FBI's Charlotte Division, Raleigh Resident Agency, Raleigh, North Carolina (NC), to investigate violations of federal law. I am assigned to the FBI's Raleigh-Durham Safe Streets Task Force (RDSSTF) to investigate violations involving organized crime, money laundering, illegal narcotics, criminal street gangs, criminal enterprises, violent crimes, and firearm violations.

   a. I have received training in basic and advanced investigative methods concerning organized crime, money laundering, gang identification, violent crime, and narcotic investigations, including the use of confidential human sources and Title III intercepts. Since February 2000 to the present, I have conducted investigations that have resulted in the arrest and conviction of numerous individuals involved with illegal narcotics trafficking, firearms violations, violent crimes, and criminal street gangs. As a result of these arrests and convictions, I have participated in the seizure of narcotics, money, United States currency, and physical assets. I have myself conducted, as well as assisted other law enforcement officers with physical surveillance, search warrants, seizure warrants and arrests of persons involved in organized crime, violent crimes, illegal drug activity, criminal street gangs, and firearm violations.

   b. As a federal agent, I am authorized to investigate violations of laws of



4

the United States and to execute warrants issued under the authority of the United States.

6. Based on our training and experience, we know that individuals involved in tax fraud activities and other financial crimes often willfully and knowingly misclassify, mislabel, or omit financial transactions and accounts from required reporting. We know that in order for criminals to conceal and hide sources of taxable income, the books and records of the business are sometimes falsified.

7. We understand that individuals involved in financial crimes often deposit all or portions of criminal proceeds into personal or business bank accounts, or bank accounts in the names of accomplices (or nominees), and oftentimes use several accounts in various financial institutions, inside and outside the United States, thereby concealing the nature, source, and ownership of the proceeds making the proceeds more difficult to identify. We also know that monetary instruments, such as money orders and cashier's checks, are utilized by individuals engaged in criminal financial schemes.

8. Also, we know that individuals involved in financial crimes and other illegal activities often place income and assets in the name of nominees in hopes of shifting their responsibility for the payment of tax and concealing their ownership to protect the assets from seizure. However, such individuals often still maintain the titles and deeds to said assets, rather than the nominee owner.

9. We also understand that individuals involved in financial crimes and other illegal activities often seek to conceal or disguise the nature, location, source,

5



ownership, or control of property through a number of means, including wire transfers of funds using financial service companies, such as traditional banks, money transfer companies (e.g., Western Union Company, MoneyGram International Inc.), and virtual currency exchanges, as well as trade-based money laundering that often involve the trading of commodity and products.

10. We also understand that the true nature, source, and ownership of assets may be determined by analyzing business and personal financial records created and maintained by legal and illegal business entities.

11. We know that individuals involved in criminal endeavors conduct financial transactions in a manner to avoid law enforcement detection. Based upon our training and experience, and consultation with other law enforcement, we know that persons involved in tax and other financial crimes oftentimes exchange currency for various types of monetary instruments, including postal money orders and bank cashiers' checks, and thereby attempt to disguise and conceal their true business and personal affairs.

12. Based on our training and experience, we know that individuals will deposit all or portions of corporate proceeds into personal bank accounts, or bank accounts in the names of accomplices (or, nominees), thereby we also know that monetary instruments, such as money orders and cashier's checks, utilized by individuals engaged in schemes to evade taxes, are often secured in safe-deposit and lock boxes.

13. SA Phillips is experienced in analyzing business and personal financial records created and maintained by legal and illegal business entities. Such analysis

6



determines the validity of the books and records and provides leads to unreported income and non-deductible expenditures.

14. In the course of this investigation, SA Eric Phillips has reviewed and analyzed: records from the IRS tax return database known as the Integrated Data Retrieval System ("IDRS"). We have both reviewed records from numerous federal, state, local, and foreign government agencies, including the financial records obtained by grand jury subpoenas, such as bank records, public records, and witness statements. We have also conducted witness interviews. The following information is based upon those sources as well as discussions with other investigators.

15. The facts in this affidavit come from our personal observations, our training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of a seizure warrant, it does not include all of the facts that have been learned during the course of this investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

### Scheme to Extort Bribes/Kickbacks

16. A reliable, confidential source, known to investigators ("CS-1"), having had a professional relationship with TEYF, dating back to when he/she and TEYF were both residents of Russia, has stated the following:

    a.    In addition to providing security to TEYF while in Russia, CS-1

7



also acted as a go-between for TEYF and business associates.

b. Anatoliy Serdyukov ("Serdyukov") served as the Russian Minister of Defense from approximately February 2007 through November, 2012. During this period, the company Voentorg became the primary contractor and private supplier to the Russian military. TEYF, Deputy Director of Voentorg, awarded contracts to subcontractors that actually fulfill the government contracts.

c. CS-1 has overheard conversations between TEYF and subcontractors wherein it was discussed that a "kickback" as a "percentage" of the contract would be paid by the subcontractor to TEYF. There was not a single percentage that was consistent across all subcontractors; instead, TEYF demanded a specific "kickback" for each industry. The example given by CS-1 was that subcontractors providing uniforms would be required to kickback one amount while a different amount would be demanded from those providing food services. According to CS-1, TEYF determined the percentage amount so that the contracted services could be provided without an "obvious decrease" in quality or quantity.

d. CS-1 was also present for multiple conversations between TEYF and Andrei Shokin ("Shokin"), the individual TEYF hired to manage TEYF's companies. The focus of these conversations was TEYF providing instruction to Shokin about how to transfer the proceeds of the kickbacks. TEYF also hired Yelena Zelenova (a/k/a Elena "Zelenova"), an accountant that maintained



records of TEYF's companies, including the kickbacks he extorted from subcontractors.

e. While the bribe/kickback scheme was being perpetrated, TEYF instructed CS-1 to meet couriers at various locations around Russia and pickup large sums of cash. The only information TEYF provided to CS-1 was a telephone number and location to make the pickup. The locations were random and included airports, highways, and various other places. CS-1 opened the packages to ensure it was money but never counted it due to the volume. After the pickup, TEYF would call CS-1 and tell him which accountant to take the cash; CS-1 took the cash to whichever accountant he was instructed. The accountants were coordinated by Zelenova but didn't work directly for her.

f. Most of the kickbacks were paid by TEYF to Defense Minister Serdyukov, with TEYF retaining the next largest share, and the remaining amount to be paid to other co-conspirators. CS-1 made three (3) deliveries of large amounts of cash to Defense Minister Serdyukov through Serdyukov's son-in-law "Puzikov". The money CS-1 delivered to Puzikov was always bundled and placed in large bags. CS-1 always had two (2) security cars escort him/her through Russia to Puzikov. CS-1 estimated the cash delivered to Puzikov to be in the amounts of $70 Million (USD), $30 Million (USD), and $50 Million (USD) for a total of $150 Million (USD).

g. Sometime in or about 2013, TEYF's and Serdyukov's scheme became public and an investigation was initiated by Chief Prosecutor

9

Fredinsky ("Fredinsky"). At TEYF's direction, $400,000 was delivered to Peredriy ("Peredriy"), an associate of Fredinsky's, in order to end the investigation. As a result of the bribe the investigation was ended and TEYF instructed CS-1 to approach Peredriy, and demand him to return the $400,000. In the conversation wherein CS-1 demanded the return of the $400,000 from Peredriy, Peredriy refused to return the money. CS-1 recorded the second conversation between CS-1 and Peredriy and has provided a copy to investigators.

 h. CS-1 would take money for TEYF or sometimes provide escorts for others taking money on behalf of TEYF to Alfa Bank in Russia. TEYF is "computer illiterate" and would regularly have CS-1 handle TEYF's emails. CS-1 has seen documents showing TEYF had transferred some money to banks in Cyprus. TEYF has stayed in Cyprus for extended periods, up to six months on occasion.

 i. CS-1 knows TEYF to be a cunning man and would oftentimes use a cellular phone for only one (1) day.

### Financial Accounts

17. Since at least December 2010, TEYF, T. Teyf, Cotter, and others have opened at least seventy (70) financial accounts using over five (5) domestic financial institutions, in the names of themselves and businesses under their control. TEYF and others have received at least 294 wires for an approximate total of $39,500,000 into four (4) accounts, BOA 3905, BOA 6014, BOA 3844, BOA 9409, held in TEYF's

name and the names of co-conspirators at Bank of America, N.A. The source of 293 of the wires for approximately $39,415,000 was foreign corporations and bank accounts in countries commonly known to be used for money laundering.

18. TEYF and others transferred the criminally derived proceeds of specified unlawful activity from BOA 3905, BOA 6014, BOA 3844, and BOA 9409 to several other accounts under the control of TEYF and others including BOA 1991, BOA 9748, BOA 3285, BOA 1736, BOA 1314, BOA 4884, FCB 3951, BBT 1502, FCB 3812, FCB 0897, and PNC 4726. From the aforementioned accounts, the criminal proceeds of TEYF's specified unlawful activities were further transferred into additional financial accounts and used to make purchases in support of the lifestyles of TEYF, T. Teyf Cotter, and others, including the purchase of luxury automobiles and real property, and were previously seized pursuant to warrants issued by this Court.[1]

19. Relevant to this affidavit, a Money Market Savings account in the name of Tatyana Teyf at First Citizen's Bank (FCB), account number ending in 0918 was determined to be funded from FCB account ending in 3951, which in turn had been funded by BOA 9748, which had been funded by one of the original four accounts opened with the international wire transfers, BOA 6014. In all, $2,400,000 of tainted funds went into FCB 0918. A review of FCB 0918 noted a balance of $2,151,278.97 as of 11/08/2018; $1,441,629.61 from that account was ultimately seized.

20. After that seizure and others, an additional account at the Bank of America was identified. This BOA account, ending in 8455, had been initially funded on

---

[1] See, 5:18-MJ-2082, 5:18-MJ-2083, 5:18-MJ-2084, 5:18-MJ-2085, 5:18-MJ-2086, 5:18-MJ-2088, 5:18-MJ-2089, 5:18-MJ-2090, and 5:19-MJ-1053.

11

October 31, 2018, with an FCB Cashier's check drawn from FCB account 0918, in the amount of $250,000.00. <u>The total amount of tainted proceeds traced to BOA account 8455 was this $250,000.00 deposit.</u> This FCB Cashier's Check in the amount of $250,000.00 was made payable to Tatyana Teyf and the listed remitter was also Tatyana Teyf.

21. For purposes of this seizure warrant, we have probable cause to believe the 2019 Toyota 4-Runner, Vehicle Identification Number (VIN) JTEBU5JR0K5620629, is subject to seizure pursuant to 18 U.S.C. §§ 981, 982, and forfeiture as property involved in money laundering transactions pursuant to 1956(a)(1), 1956(a)(2), 1957, and 1956(h) based on the following:

    a. Prior to becoming a resident of the United States, TEYF conspired with senior Russian government officials to extort bribe/kickbacks from subcontractors of large Russian military contracts. TEYF employed others to facilitate the transfer of his portion of the proceeds from the criminal scheme to financial institutions in foreign countries, largely consisting of the high-risk jurisdictions of Cyprus and Hong Kong.

    b. After arriving in the United States TEYF received 294 wires from foreign sources worth over $39,500,000, into bank accounts in the name of TEYF, Cotter, and T. Teyf, who stated to U.S. Officials that she was a homemaker. TEYF and co-conspirators attempted to conceal the source of the foreign wire by using shell corporations organized in countries known to harbor money laundering operations. Additionally, the wires received by TEYF

12

included descriptions such as "Payment for Buying Business," for approximately $9,285,000 despite declarations made to U.S. Officials that the owners of FG Delta Plus did not include TEYF; "Payment for Services"/"Payment for Goods" for approximately $8,160,000, despite TEYF reporting a collective net loss in the years 2011 – 2014 on his U.S. Individual Income Tax Returns; and "Transfer for Own Funds" for approximately $4,040,000, despite declaring that neither TEYF or T. Teyf had a financial interest in or signature authority over a financial account located in a foreign country.

    c.    From 2011 – 2013, TEYF and others conspired to use financial institutions of the United States to launder over $39,415,000 of criminal proceeds from schemes TEYF organized prior to his residency in the United States.

22. The funds contained in BOA 3905, BOA 6014, BOA 3844, BOA 9409, BOA 1991, BOA 9748, BOA 3285, BOA 1736, BOA 1314, BOA 1292, BOA 3691, BOA 1563, BOA 7892, BOA 4884, BOA 0990, FCB 3951, FCB 0918, BBT 1502, FCB 3812, FCB 0897, BBT 4304, PNC 4726, PNC 4742, and Merrill Lynch accounts 0857, 1096, and 0890 represented the proceeds of specified unlawful activity due to TEYF's use of the aforementioned accounts, nominees, and co-conspirators to launder the proceeds of a criminal bribery/kickback scheme. Monies coming from any of those accounts, up to the amount of tainted funds in each account, is also tainted. This would include BoA

13

8455, funded by FCB 0918, and any items purchased with tainted frunds from tainted accounts.

23. On 01/09/2019, Tatyana Anatolyevna Teyf, 6510 New Market Way, Raleigh, North Carolina 27615, purchased a new 2019 Toyota 4-Runner, Vehicle Identification Number (VIN) JTEBU5JR0K5620629, V-6, blizzard pearl in color, from Leith Toyota, 8005 Capital Boulevard, Raleigh, NC 27616. The total price listed on the Purchase Agreement dated 01/09/2019, was $46,939.13. The Purchase Agreement, the Customer Copy of the Cash Receipt, the Conditional Delivery Agreement, and the Leith Toyota Lifetime Trust agreement, all listed Tatyana Anatolyevna Teyf as the purchaser of the Toyota 4-Runner. Leith Toyota also made a copy of Tatyana Anatolyevna Teyf's North Carolina Driver's License, driver's license number 30961901, displaying her full name, address, driver's license photo, and listing her date of birth as 07/28/1977.

24. Included in the Leith Toyota records was a Bank of America Cashier's Check, Number 0764812762, dated 01/09/2019. The Cashier's Check was made payable to Leith Toyota in the amount of $46,939.13, and the remitter was listed as Tatyana A. Teyf. A State of North Carolina Limited Registration Card, listed the Toyota 4-Runner with the vehicles VIN number and Tatyana Anatolyevna Teyf as the listed owner. Additionally, included was a Wake County, NC vehicle property tax bill listing the 2019 Toyota 4-Runner, addressed to Tatyana Anatolyevna Teyf, 6510 New Market Way, Raleigh, NC 27615. The tax bill was due on 03/31/2019, in the amount of $520.28.

14



25. A review of banking records obtained via Grand Jury subpoena revealed the Bank of America Cashier's Check, noted above, and utilized to pay for the 2019 Toyota 4-Runner was funded from Bank of America account 8455. This account (8455) is in the name of Tatyana A. Teyf, 6510 New Market Way, Raleigh, North Carolina 27615.

26. As previously noted in paragraph 24, Bank of America account 8455 was initially funded on 10/31/2018, by a First Citizen's Bank (FCB) Cashier's Check in the amount of $250,000.00, drawn from FCB account 0918, which itself was created with tainted funds.

27. The defendant's funds and proceeds traceable thereto are identical to property involved in, or traceable to, transactions or attempted transactions in violation of 18 U.S.C. § 1956 and 1957. Therefore the aforementioned assets are liable to condemnation and forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1).

28. Because the property sought to be seized can be easily moved or transferred, out of the reach of the United States a restraining order under Title 21, United States Code, Section 853(e) would not be sufficient to assure the availability of the property for forfeiture.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

Further the affiants saith naught, this 4th day of September, 2019.

*Eric J. Phillips*
ERIC J. PHILLIPS
SPECIAL AGENT
INTERNAL REVENUE SERVICE

*Robert A. Richards Jr.*
ROBERT A. RICHARDS, JR.
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

On this 6th day of September, 2019, Eric J. Phillips & Robert A. Richards, Jr. appeared before me via reliable electronic means, placed under oath, and attested to the contents of this Affidavit.

*Robert T. Numbers II*
ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE

16

ATTACHMENT A

1. 2019 Toyota 4-Runner, Vehicle Identification Number (VIN) JTEBU5JR0K5620629

1